**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2816-24

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JEFREY VASQUEZ-CALDERON,

    Defendant-Appellant.

_____

Submitted May 20, 2026 – Decided July 9, 2026

Before Judges Vanek and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 19-05-0302.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Janetta D. Marbrey, Mercer County Prosecutor, attorney for respondent (Laura Sunyak, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jefrey Vasquez-Calderon appeals from an October 22, 2021 order denying his motion to suppress a recorded statement to police and a February 11, 2022 order denying in part his motion to suppress physical evidence seized before subsequent issuance of a search warrant. We affirm.

I.

On February 27, 2019, at approximately 8:00 a.m., East Windsor police discovered Luis Sanchez (decedent) lying in a pool of blood in the rear yard of his apartment complex residence. Detective Luis Vega interviewed the decedent's roommate and showed him a still image from surveillance footage taken at about 2:00 a.m. that same day at "Exit 8" bar, depicting decedent and another individual. The roommate identified the other person in the still image as "Flaco," decedent's co-worker. The roommate and decedent's girlfriend later identified defendant as Flaco.

Police learned defendant was working elsewhere after being fired from his former job where he had worked with decedent. Detectives located defendant at his new workplace in the late evening of February 27 and informed him they wanted to speak with him at the Mercer County Prosecutor's Office (MCPO). Defendant agreed to speak with detectives. Members of the Cranbury Police Department drove defendant to the MCPO for questioning as a "person of

interest."  Before placing defendant in a patrol car, the police took defendant's cell phone, wallet, work vest, and lunch bag.

While defendant was at the MCPO, police searched the premises of defendant's workplace with the owner's permission.  They found a wet sweater in a dumpster.[1]  The sweater matched that worn by the man accompanying decedent in the video footage from Exit 8 bar.

Before conducting the interview, police placed defendant uncuffed in a locked interview room.  As Detective Vega later testified, the door to the interview room "is always locked" because "we don't allow anyone to walk freely on [the Homicide Task Force] floor.  There's a lot of sensitive case information up there."  The detective testified that for the same reason, if interviewees "need anything," to use the restroom, for example, they must knock on the door and be escorted by an officer.

Defendant waited in the interview room for roughly two hours until two Spanish-speaking detectives arrived to conduct the interview.  The interview began at approximately 12:50 a.m. on February 28.  The detectives administered

---

[1]  Throughout the proceedings, witnesses and counsel referred alternatively to the garment in question as a "sweater" or a "sweatshirt."

A-2816-24

<u>Miranda</u> rights, which defendant waived.[2]  After speaking with detectives for about one hour, defendant requested counsel and, consequently, detectives terminated the interview.

During questioning, defendant said "he'd been wearing [the] clothing that he had on at the time of the interview for the past two or three days."  However, because the surveillance footage showed defendant wearing the now-recovered sweater, "not the clothing he had on at the time [of the interview] which . . . was a flannel shirt," detectives believed he was lying.

Detectives also questioned defendant about text messages exchanged with his girlfriend on the afternoon of the murder, in which defendant revealed he knew of decedent's death.  Detective Vega found this information "significant" because he did not "believe that information was out there yet."  After this interview, officers photographed defendant to document "injuries on his hands."  Consequently, detectives reclassified defendant as a suspect rather than a person of interest.

At approximately 3:00 a.m., defendant knocked on the interview room door and requested to speak with detectives.  They again administered <u>Miranda</u> rights and conducted a second interview.  After the second interview concluded,

---

[2]  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Immigration and Customs Enforcement agents took defendant into custody and held him in the Essex County Jail on an immigration detainer.

Because detectives determined defendant was the last person to be seen with decedent, Officer Janae Jones applied for a warrant to search defendant's cell phone based on defendant's premature knowledge of decedent's death as conveyed to detectives during the first interview.

On May 28, 2019, a Mercer County grand jury returned an indictment charging defendant with: murder, N.J.S.A. 2C:11-3(a)(1) (count one); third-degree possession of weapon for unlawful purpose, N.J.S.A. 2C:39-4(d) (count two); and fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count three).

Before trial, defendant moved to suppress his statements to police and evidence seized without a warrant, arguing he had been arrested without probable cause when taken from his place of employment and made to wait in a locked interview room. Defendant also contended that detectives—not he—had initiated the second interview.

Detective Vega testified regarding both issues. The court denied both motions, finding Detective Vega's testimony credible. The court rejected defendant's claims of unlawful arrest and improper re-initiation of questioning

5

based on its assessment of defendant's desire to make both statements, consistent with his demeanor and Detective Vega's testimony. The court also ruled the evidence collected was not "fruit of the poisonous tree," as police had probable cause to arrest defendant after detectives understood the significance of defendant's incriminating statements in his first interview. The State conceded at the motion hearing that defendant was "no longer free to leave the [MCPO]" and was effectively under arrest at the conclusion of the first interview.

Defendant moved for reconsideration. In response, the State presented additional testimony from Officer Jones, focusing on the seizure of defendant's lunch bag and cell phone and subsequent warrant for the phone. At conclusion of the hearing, the court suppressed the lunch bag but denied suppression of the cell phone. The court reasoned police had probable cause to seize the cell phone when, at the time of the seizure, police knew: (1) defendant was the last person seen with decedent; (2) defendant and decedent were together at Exit 8 Bar in the early morning; (3) defendant had exchanged text messages with his girlfriend referencing decedent's death; and (4) defendant had early knowledge of the death.

The court also found exigent circumstances justified seizure of the cell phone. The court observed that were defendant permitted to keep the phone

6

while being transported to the MCPO, the phone "could be smashed, [the message data] could be deleted."

> So, I do find that that gives rise to the police for having probable cause to believe that evidence related to a crime would be found on the phone. And for that reason I think they had a right to seize the phone considering that if they hadn't, it could have been destroyed or in some way compromised and seize it until they applied for a warrant and that's what they did. And for that reason I am denying . . . defendant's motion to suppress the physical evidence, the cell phone that was taken. . . .

The court found no probable cause or exigency to exist in connection with defendant's lunch bag or its warrantless seizure and suppressed that evidence.

In September 2022, defendant pleaded guilty to count one of the indictment, as amended to first-degree aggravated manslaughter. In exchange, the court sentenced defendant to a twenty-two-year term of incarceration, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, as agreed between the State and defendant.

Defendant appeals, raising the following arguments:

POINT I

THE CELL PHONE SHOULD BE SUPPRESSED BECAUSE IT WAS SEIZED WITHOUT PROBABLE CAUSE IRRESPECTIVE OF WHETHER PROBABLE CAUSE TO SEARCH THE PHONE WAS LATER DEVELOPED.

7

POINT II

DEFENDANT'S STATEMENTS AND THE PHOTOGRAPHS TAKEN OF HIM SHOULD BE SUPPRESSED BECAUSE THEY WERE THE DIRECT RESULT OF AN UNLAWFUL ARREST.

II.

"Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Gamble, 218 N.J. 412, 424 (2014)). This is because the trial court had the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "Thus, appellate courts should reverse only when the trial court's determination is so clearly mistaken that the interests of justice demand intervention and correction." Gamble, 218 N.J. at 425 (internal quotation marks omitted) (quoting Elders, 192 N.J. at 244).

"A trial court's interpretation of the law, however, and the consequences that flow from established facts are not entitled to any special deference." Ibid. (citing State v. Gandhi, 201 N.J. 161, 176 (2010)). "Therefore, a trial court's legal conclusions are reviewed de novo." Ibid. (citing Gandhi, 201 N.J. at 176).

8

Such legal conclusions encompass possible violations of the Fourth Amendment to United States Constitution and Article I, Paragraph 7 of our State Constitution. See State v. Missak, 476 N.J. Super. 302, 314 (App. Div. 2023) (holding the validity of a search warrant is a "purely legal" question) (internal quotation marks and citation omitted). Even in the Fourth Amendment context, "[w]e accord substantial deference to a trial court's determination that there was probable cause to issue a warrant." State v. Marshall, 199 N.J. 602, 612 (2009) (citing State v. Jones, 179 N.J. 377, 388-89 (2004)).

"Probable cause exists when the totality of the facts and circumstances presented to an arresting officer would support a person 'of reasonable caution in the belief that an offense has been or is being committed.'" State v. Torres, 253 N.J. 485, 503 (2023) (quoting State v. Sims, 75 N.J. 337, 354 (1978)). Probable cause to arrest "is something less than [the] proof needed to convict and something more than a raw, unsupported suspicion." State v. Davis, 50 N.J. 16, 23 (1967).

"Exigent circumstances may excuse the need for the police to obtain a warrant." State v. Miranda, 253 N.J. 461, 480 (2023) (quoting State v. DeLuca, 168 N.J. 626, 632 (2001)). Under the exception, police may perform a warrantless search when "officers have an 'objectively reasonable basis to

believe that prompt action is needed to meet an imminent danger.'" Ibid. (quoting State v. Hemenway, 239 N.J. 111, 126 (2019)).

The "preeminent determinants of exigency" are "[p]olice safety and the preservation of evidence[.]" Ibid. (alteration in original) (quoting In Int. of J.A., 233 N.J. 432, 448 (2018)). "In the typical setting in which our courts have found exigency, 'there was an objectively reasonable basis to believe that lives might be endangered or evidence destroyed by the delay necessary to secure a warrant" because in those situations, "time was of the essence, and delay was not a reasonable option." Ibid. (quoting State v. Manning, 240 N.J. 308, 337 (2020)). Generally, to invoke the exception, the State "must prove by a preponderance of the evidence that (1) the search was premised on probable cause and (2) law enforcement acted in an objectively reasonable manner to meet an exigency that did not permit time to secure a warrant." Ibid. (quoting Manning, 240 N.J. at 333).

"Similar to probable cause, the term 'exigent circumstances' is, by design, inexact. It is incapable of precise definition because, by its nature, the term takes on form and shape dependent on the facts of any given case." Ibid. (quoting State v. Nishina, 175 N.J. 502, 516 (2003)) (internal quotation marks omitted). Courts consider the following "non-exclusive" list of factors:

(1) the seriousness of the crime under investigation, (2) the urgency of the situation faced by the officers, (3) the time it would have taken to secure a warrant, (4) the threat that evidence would be destroyed or lost or people would be endangered unless immediate action was taken, (5) information that the suspect was armed and posed an imminent danger, and (6) the strength or weakness of the probable cause relating to the item to be searched or seized.

[Id. at 481 (quoting Manning, 240 N.J. at 333-34).]

"The determination whether exigent circumstances existed at the time of the disputed search 'is fact-sensitive' and requires the court to assess 'the totality of the circumstances.'" Ibid. (quoting J.A., 233 N.J. at 448).

Having reviewed the record, and applying these principles, we are satisfied the trial court did not err in denying defendant's motion to suppress the cell phone. The court's findings regarding probable cause were supported by sufficient credible evidence in the form of testimony, as corroborated by video footage and information from witnesses, particularly defendant's girlfriend. S.S., 229 N.J. at 374. The exigent circumstances exception applies to the seizure of the phone here because, as the trial court found, defendant could have destroyed the phone and the evidence it contained while on the way to the MCPO.

Defendant additionally argues that, even assuming the trial court's

11

determination that defendant initially voluntarily agreed to go to the MCPO to give a statement was correct, it became an unlawful arrest when detectives transported defendant in a police car, seized his personal effects, never informed him he was free to leave, and kept him in a locked room for two hours before beginning the interview. Based on this sequence of events, defendant maintains his statement and the photographs "flowed directly from his unlawful arrest" and should be suppressed.

We disagree. The touchstone of an arrest is whether a reasonable person in the situation would feel free to end the encounter with police. State v. Shaw, 213 N.J. 398, 410 (2012). If a police officer's conduct is more than what is "minimally intrusive" than required to investigate, it can be regarded as an arrest. State v. Dickey, 152 N.J. 468, 478 (1998).

Here, the court reasonably found defendant went voluntarily to the MCPO to be interviewed because he wished to speak to them. Contrary to defendant's position, the seizure of his personal effects, transportation in a police car, and extended wait for Spanish-speaking assistance was not tantamount to arrest. The court found credible testimony that these measures were taken to conform with safety protocols with respect to the seizure, transport, and security at headquarters. Moreover, in this instance, extra time was needed for arrival of

Spanish-speaking detectives to conduct the interview. Defendant was not handcuffed during the pertinent time and was free to knock on the door for bathroom access or other needs. Although restrictive to some degree, whether considered separately or in combination, none of these measures negate the substantial evidence of voluntariness or transform the encounter into an arrest, as the trial court properly concluded.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Hanley

Clerk of the Appellate Division

A-2816-24